**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

Western Division

| | |
|---|---|
| **EDBQ, LLC** )<br>)<br>       **Plaintiff,** )<br>)<br>       **v.** )<br>)<br>**ILLINOIS DEPARTMENT OF FINANCIAL** )<br>**AND PROFESSIONAL REGULATION;** )<br>**BRETT BENDER, DEPUTY DIRECTOR** )<br>**OF MEDICAL CANNABIS; and** )<br>**AS-YET UNKNOWN JOHN DOES,** )<br>)<br>       **Defendants.** ) | **No.** _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff, EDBQ, LLC, by its attorneys, Robert M. Fagan, Ltd. hereby submit this Complaint against Defendants. In support of the relief requested herein, Plaintiff states as follows:

**INTRODUCTION**

1.  The State of Illinois, by way of Senate Bill 7, through the Illinois Department of Financial and Professional Regulation ("Department"), proposed to award 75 Conditional Adult Use Cannabis Dispensary Licenses ("Licenses") on May 1, 2020 to applicants who submitted a Conditional Adult Use Cannabis Dispensary License application ("Application") with the Department on or before January 2, 2020.

2.  On April 30, 2020, Governor Pritzker suspended the

awarding of these licenses to a later undetermined date and time.

3.     On September 3, 2020, the State of Illinois, through the Department, awarded Conditional Adult Use Cannabis Dispensary License application scores (Scores) and proposed to award the above-described 75 cannabis dispensary licenses collectively worth more than $1,000,000,000 (billion) dollars to a group of 21 companies, many if not most owned by politically-connected insiders.

4.     However, on September 3, 2020, Plaintiff did not receive Conditional Adult Use Cannabis Dispensary License application score (scores). Plaintiff, to this date, has still not been awarded a score for their application.

5.     Although there was purportedly an open competition to determine eligibility for these 75 licenses, the Department announced plans to award the 75 licenses to these 21 companies by lot (hereafter, the "Lottery") without providing any opportunity for administrative or judicial review for the 4,000+ applicants whom the State has deemed ineligible to participate in the Lottery. Furthermore, the Department never awarded the Plaintiff a score for their application.

6.     On September 22, 2020, in response to public outcry over the lottery system, the Department issued a statement called the "Conditional Adult Use Dispensing Organization License Supplemental Deficiency Notice Process" (Deficiency Process). This

2

deficiency process stated that the Department will provide applicants who did not received a perfect score and were excluded from the lottery a supplemental deficiency notice. The supplemental deficiency notice will gave applicants that did not receive the maximum number of points on any exhibit at least 10 days to (a) submit an amended application exhibit or (b) request that the Department review any original application exhibit for potential scoring errors or inconsistencies. Following this deficiency process, the Department will award the 75 Conditional Licenses among tied applicants pursuant to a lottery consistent with the Department's administrative rules. At the time of this deficiency process, Plaintiff had not received their score from the department.

7. The Plaintiff has called and emailed the Department on numerous occasions in order to receive a score, but Plaintiff's emails have been ignored and phone calls have always resulted in a promised called from an official at the department to give Plaintiff their score. However, Plaintiff has still not received their score.

8. The Department's decision to go forward with a plan to award more than a billion dollars in licenses to a group of 21 politically-connected insider companies and additional companies that will join the lottery without awarding the Plaintiff a score

3

is unconstitutional, and cannot be permitted.

9. As such, there are serious, obvious and objectively verifiable problems with way the Plaintiff's application was not scored and the fact that the Plaintiff was never given a score by the Department. Accordingly, in conjunction with this Complaint, Plaintiff herein seek injunctive relief for the reasons specified below.

## JURISDICTION AND VENUE

10. This court has jurisdiction pursuant to 28 U.S.C. 1331 and 28 U.S.C. 1367, as Plaintiff brings a federal claim arising under the United States Constitution as well as a state law claim so related as to form part of the same case or controversy. Venue is proper in this Court pursuant to 28 U.S.C. 1391, as the events giving rise to these claims occurred in this district, some of the Plaintiff resides in this district and the agency Defendant maintains its offices in this district.

## PARTIES

11. Plaintiff EDBQ, LLC, is a social equity applicant majority owned and controlled by a veteran, who is a long-time resident of a disproportionately impacted area of Freeport, Illinois. The team includes African American ownership that runs a non-for-profit Illinois Company that sets up a network of

4

therapists and providers to help veterans find physical treatment through assisting veterans obtain medical marijuana licenses, as well as mental health treatment. This team also has female ownership. Furthermore, this team also includes current processors and cultivators of medical cannabis, community organizers, small business owners and young professionals.

12. Defendant Bret Bender is the Deputy Director of the Defendant Illinois Department of Financial & Professional Regulation (the "Department"). Mr. Bender is sued in his official capacity.

BACKGROUND

13. In 2014, the General Assembly passed a law to award licenses to a limited number of companies to sell medical marijuana in Illinois. Called the Compassionate Use of Medical Cannabis Act (the "Act"), the law created for the first time in Illinois a system of licensing dispensaries through which it would be legal to sell marijuana to patients suffering from conditions that are alleviated by marijuana. The Act places the Department in charge of the licenses.

14. Unlike some states in which there are an unlimited number of dispensary licenses, Illinois chose to strictly limit the number of available licenses. That limitation has made these licenses extremely valuable. Some recipients of these licenses have sold their dispensaries for tens of millions of dollars.

15. In 2019, the General Assembly amended the Act, creating

rights to up to 60 new "Early Approval" secondary site dispensary licenses. 410 ILCS 705/15-15. Because, as described above, the State awarded 55 of the 60 available dispensary licenses in the original round, there are likewise 55 businesses eligible for Early Approval secondary site licenses.

16. The Act as amended provides that the only people eligible to win the 55 new Early Approval dispensary licenses are the set of people who already own companies holding existing dispensary licenses. As it turned out, the only companies with existing dispensary licenses are majority-owned by Caucasian males. Zero companies with existing licenses are majority-owned by women or by minorities.

17. There was considerable public outcry over the decision to award the next 55 dispensary licenses to the same people who already owned the existing dispensaries, and one of the primary criticisms was that this decision effectively shut of the cannabis industry many small business owners and entrepreneurs in disadvantaged communities most affected by the War on Drugs.

18. To try to justify this unequal distribution of valuable State resources, the amended Act further provides that minority-owned and female-owned businesses, while ineligible to apply for any of the 55 Early Approval licenses, would nonetheless be eligible to apply for a third round of dispensary licenses, consisting of 75 new licenses, scheduled to be awarded before the end of 2021.

6

19. In 2019, the Department announced a process to award these 75 Licenses. To compete for them, companies could apply and would be graded on various measures, with up to 252 total points.

20. The Department selected KPMG via a no-bid, $4.2M contract to grade the applications.

21. To facilitate participation in the nascent cannabis industry by people disproportionately affected by the War on Drugs, the State announced that 50 of the 250 possible points would be awarded to applicants who qualify as Social Equity Applicants, meaning that the company was majority-owned by person(s) who, for example, either lived in certain zip codes designated as disproportionately affected, or who had prior cannabis arrests.

22. The Defendant, as well as the State and its Governor, promised that this round of new licenses was specifically designed diversify the cannabis industry and open it to Social Equity Applicants who had traditionally been excluded. Members of communities in need of economic development were encouraged to apply. Many did, investing considerable money, sometimes their entire life savings. Numerous teams made up of true Social Equity Applicants spent a year or more preparing applications for a chance to participate.

23. The State announced a special fund of $20M fund help Social Equity Applicants finance their dispensary businesses in the event they won. Traditional rules that would have required applicants

7

to own and control property during the application process (an expensive proposition) were waived.

24. To further level the playing field, according to the FAQs published by the Department, many of the measures on which applicants were evaluated were designated to be graded via binary scoring, *i.e.*, pass/fail: the applicant either got all of the points, or did not. Among the measures that were designated pass/fail included the applicant's experience in cannabis, its diversity status, social equity and veteran status, and its community plan.

25. By making the scoring on these key measures binary, the Department created a contest where applicants could not distinguish their credentials on factors such as experience, diversity, and community involvement. The implication of such a scoring system is that many, if not most, applicants would receive maximum (tie) scores.

26. More than 700 companies submitted a total of more than 4,000 applicants. Many of those 700 companies, including the Plaintiff, were majority-owned by true Social Equity Applicants who live in economically disadvantaged areas.

27. In August of 2020, the Department announced emergency rules providing for what would happen if there was a tie for the highest scoring applicants. All such applicants thus became eligible to participate in the Lottery (hereafter, "Tied Applicants").

28. For purposes of the Act, the State is divided into 17

Regions. For most of the State's Regions, the Department will award one to three licensees via this Lottery process. The primary exception was the Region covering the greater Chicagoland area, for which 47 Lotteries will be held to award the 47 Licenses.

29. On September 3, 2020, the Department published a list of Tied Applicants, all of whom scored the maximum 252 points. There were a grand total of only 21 companies, or less than 3% of the total number that applied, and a number of them appear to have overlapping ownership. At this date, Plaintiff was not furnished a score.

30. On September 22, 2020, after public outcry, the Department published the Deficiency Process in order to give applicants who did not receive the maximum number of points, the ability to correct their deficiencies, while the Department still failed to furnish the Plaintiff with a score.

31. Under the State's present plan, each of those Tied Applicants and applications who correct their deficiencies and receive a perfect score who applied in a given Region will be allowed to participate in the 75 Lottery drawings by which these 75 Licenses will be awarded by lot. However, Plaintiff has not been awarded a score by Department and has been given not opportunity to correct after being awarded a score.

32. Unlike most graded competitions for cannabis licenses,

this one did not control for political influence or bias by scoring anonymously. The vast majority of states that conduct competitions to award cannabis licenses do so via a process that requires applicants to redact the names and affiliations of their principals from the graders for grading purposes.

33. Inexplicably, this competition was not graded anonymously. The application and the FAQs were clear that the Exhibits that would allow KPMG to identify the principal officers of each applicant were to include all personal identifying information. And unlike in other states where an anonymized email address was required for contact purposes through the deficiency process, applicants also received deficiency notices to their personal email accounts directly from KPMG and used those same email addresses to login to the KPMG online portal to upload any exhibits for which they received a deficiency.

34. Based on their corporate registrations, at least some of the 21 Tied Applicants declared eligible for these enormously valuable licenses (collectively worth more than a billion dollars) are politically connected. These include, for example, separate groups owned by a former Superintendent of the Chicago Police Department; Illinois gaming operators, including the president of Lucky Lincoln Gaming, a slot machine

10

company, partnered on the application with a Senior analyst in Illinois government; the Executive Director of the Illinois cannabis lobbying group, NORML; the owner of a private equity/real estate fund; the owner and namesake of an iconic Gold Coast restaurant/brand teamed up with several politically-connected individuals, including the former Director of Operations for the Illinois House Republican Organization; a Democratic Committeeman who is also a lobbyist; and three separate groups associated with the law firm of Bob Morgan, the original Governor-appointed Director for the Illinois Medical Cannabis Program.

35. According to his web bio, Morgan was one of the primary architects who created not only the Program itself, but the original "selection process for licensed dispensary facilities." Hiring the law firm of a tied-in lobbyist is obviously not a crime, but it bears note that a minimum of one-seventh of the winners (3 of the 21) appear to have retained the firm of someone who not only had top-tier connections, but may well have had additional insight into the "secret-formula" maximum scoring process, a process that only 21 of 700+ companies were somehow able to navigate successfully.

36. Additionally, at least one Tied Applicant lists as a Manager a person identified on LinkedIn as a risk consultant

for KMPG, the contractor that decided (not anonymously) which very few companies would participate in the Lottery.

37. There appear to be at most one or two true, wholly-owned social equity companies. Even more curious, very few of the 21 have any obvious connected to the cannabis industry, begging the question of what metric could have justified their selection from among the 700+
others.

38. To date the Department has released no score to the Plaintiff and has not provided an explanation for why Plaintiff was not issued a score. As a result, Plaintiff has not been given a chance to correct any deficiencies in their score pursuant to the deficiency process.

39. Having established a procedure where the State is going to give away more than a billion dollars of valuable Licenses, it is unconstitutional to deny Plaintiff a score, any reason why they were not awarded a score and any timely ability to challenge why they were not selected to participate in this lottery. Due process requires a procedure made available in time to obtain a meaningful remedy by participating in the Lottery process.

40. Moreover, state law authorized a total of 75 Licenses; there is no statutory authorization to award more Licenses. If

12

the Plaintiff is not awarded a score and the Lottery proceeds and these Licenses are awarded, the winning applicants begin the process of building their dispensaries. The Department will likely argue that there is no ability to make whole (award a new License) to any unsuccessful applicants who can subsequently prove they should have been permitted to participate in the Lottery, much less that they would have won a License by lot.

41. Plaintiff should have been scored and qualified to be a Tied Applicant. Plaintiff is majority-owned by Social Equity Applicants, and Plaintiff is qualified to operate a dispensary business. Plaintiff submitted an application that should have received all of the available points.

42. On September 3, 2020, the same day the Department announced the 21 Tied Applicants, the Defendant did not issue Plaintiff a score, and therefore Plaintiff would be unable to cure any defects and would be ineligible to participate in the Lottery. Plaintiff was never issued a score and therefore Plaintiff was never issued a copy of the Department's determination notification, which was apparently identical for each of the 4,000+ unsuccessful applicants. The Department provided no explanation, no information about not issuing Plaintiff a score and no reason or even information about why

13

they had not been deemed a Tied Applicant.

43. The same day that other applicants were informed that they were not Tied Applicants eligible to participate in the Lottery, Plaintiff called, left voicemails and emailed the Department multiple times to inquire as to why we have not received a score and requested additional information. The information sought included Plaintiff's scores and scorecards and any or all documents memorializing the reasons/rationale why Plaintiff did not receive a score and/or score enough points to become Tied Applicants, and any and all documents relating to the scores of those that did.

44. The Department has not responded to a single email. Two agents of the Department have contacted the Plaintiff. However, the first Department agent contacted the Plaintiff over a week after a first voicemail was left with the Department and the first agent could not answer the question of why the Plaintiff had not received a score and stated that a second department agent would be contacting Plaintiff to furnish Plaintiff a score. Over a week after communications with the first Department agent, the second department agent contacted the Plaintiff and stated that agent did not know why the Plaintiff did not have a score and that a third department agent would be contacting Plaintiff. To date, no one else from

14

Department has contacted Plaintiff.

45. Furthermore, the Act states that applicants get opportunity to cure any deficiencies with their applications. Specifically, 410 ILCS 705/15-30(b) states as follows (emphasis added):

If the Department receives an application that fails to provide the required elements contained in this Section, the Department **shall issue** a deficiency notice to the applicant. The applicant **shall have** 10 calendar days from the date of the deficiency notice **to resubmit the incomplete information**. Applications that are still incomplete after this opportunity to cure will not be scored and will be disqualified.

46. The dispensary application itself states (emphasis added):

If the Division receives an application that is **deficient in any respect**, the Division will issue a deficiency notice via e-mail to the primary and alternate contacts identified on the application form. The applicant will have 10 calendar days from the date the deficiency notice is sent to submit the information requested. If the applicant does not provide all required information necessary to make its application complete within the allotted time, the application will be rejected and not considered for a

15

license, and the application fee will not be returned.

47. In practice, the Department correctly interpreted the Act to require it to provide applicants an opportunity to cure any shortcomings in the applications as submitted.

48. Plaintiff received a notice, by email from the Department during the grading period dated May 7, 2020, from FPR.AdultUseCannabis@illinois.gov under the subject line "**Notice of Deficiency in Dispensary Application.**" An illustrative example of this notice states in relevant part:

This e-mail serves as your notification that one or more deficiencies have been identified in your application for a Conditional Adult Use Dispensing Organization License. Please carefully read the instructions below and submit the information addressing the identified deficiencies.

You have **10 calendar days** beginning the day after the date this e-mail was sent to submit the required information in the manner described below. Submissions delivered to the Illinois Department of Financial and Professional Regulations by any other means or after this timeframe will not be accepted. In your submission, do not include any supplemental information related to your application other than that required to address the identified deficiencies. Such supplemental information will not be considered in the review and scoring process. Please note that deficiencies identified are not comprehensive of all applicable statutes identified in the Cannabis Regulation and Tax Act (410 ILCS 705/).

**IMPORTANT: If you do not submit the required information in the required manner within 10-calendar days, your entire application will not be scored and will be disqualified.** (410 ILCS 705/15-30(b)). You will **NOT** receive a refund of your application fee.

Below, are the deficiencies in your application that have been identified at this time. This may not be a complete list of all deficiencies in your application, so please continue to monitor your e-mail account for additional correspondence regarding other deficiencies that may be identified in the future.

**Instructions for Submitting Information to Address Deficiencies:**

1. Review the list below to learn which deficiencies apply to your application.

2. Prepare responses in PDF format addressing each deficiency. A separate PDF document should be created for each Exhibit in which a deficiency has been identified. Unless the deficiency is that an entire Exhibit is missing, only submit supplemental information and materials that address the deficiency identified. For each corrected Exhibit, title the document "Exhibit [letter of exhibit]_[Organization FEIN Number or Organization Name]_Deficiency_[Region ID(s) separated by underscores]."

**File Naming Convention Example:** Exhibit N_81-3780373-Deficiency_1_4_10_17

****

3. Once you've assembled your PDF responses, you will access the Secure File Transfer Protocol (SFTP) file as described in the information below with the following username and password. For SFTP related questions only, please contact the following email address: us-advIDFPR@kpmg.com and a resource will get back to you promptly. We recommend logging into the SFTP as soon as possible to determine any access issues as extensions to submit your content beyond the 10 calendar days will not be provided.

**** _____

**Listing of alphabetical deficiencies in your Application as provided by Section 15-30(b) of the Cannabis Regulation and Tax Act:**

**BLS Region:** *** **Northwest Illinois Nonmetropolitan**

Exhibit F
The proposed business plan did not include the requirement for an estimated volume of cannabis the applicant plans to store at the dispensary.


   In your response please provide all relevant documents, combined in one searchable PDF file, by exhibit to support your assertion(s)


        49. Plaintiff that received this and similar notice and

cured all of the problems within the ten calendar days. However, no

score was ever issued by the department.

50. The Department cannot deprive any applicant from a score specified in statute, much less selectively enforce the rules of this competition. Furthermore, the Department can not deprive the Plaintiff of the ability to correct any deficiency pursuant to the deficiency process.

51. The way the process has been set up by the Department, Plaintiff is being denied any answer to why they have not received a score and any post announcement hearing to challenge the denial of their eligibility to participate in the Lottery.

52. Absent emergency injunctive relief, by the time Plaintiff has any opportunity for judicial review in this Court, they will have no remedy. The State will argue that it is too late to afford them a License, because the Plaintiff will not have been awarded a score, not have had the time to review and correct if necessary any deficiencies and the Lottery will have already occurred, and the 75 dispensaries will be under construction. The State will further argue that there is no entitlement to damages because once the Lottery is over, Plaintiff could never prove definitively that their lot would have been drawn entitling them to a License.

53. This process does not comport with due process. Where the State is awarding enormously valuable Licenses to politically connected insiders, there has to be at least some opportunity for

meaningful judicial review. Because the process here was specifically designed to avoid that opportunity, the Lottery should be enjoined until the State provides Plaintiff (and all others who ask) a score and the opportunity to challenge the Department's decision and the information with which to do so, as well as the ability to receive a chance for a license should the Court deem that appropriate.

**CAUSES OF ACTION**

**COUNT ONE – DUE PROCESS**
**42 U.S.C.1983**

54. Plaintiff realleges all allegations of this Complaint as if fully set out herein.

55. By all of the above, Defendants, and each of them, are improperly denying Plaintiff the statutory rights in the application process to which they are entitled. Defendants are also denying Plaintiff the right to a score and the right to participate in the lottery despite their satisfaction of the objective criteria to determine the participants. Defendants refuse to give any process to challenge their actions. As a result, Plaintiff is being deprived of property rights without due process of law and lack an effective remedy. Plaintiff has been injured as a direct and proximate result.

56. Plaintiff is entitled to a score and also entitled to sufficient notice of the Department's findings of a deficiency(ies) and the basis therefore as well as an opportunity to

respond with correction in accordance with the statutory procedures and the procedures afforded other applicants. Plaintiff is also entitled to be notified of the basis, if any, underlying the Department's decision that they are not a Tied Applicant, and a fair hearing process to challenge that basis. Moreover, these processes must be afforded at a meaningful time when relief can still be effectively granted, *i.e.*, while Plaintiff still has the opportunity to participate in the Lottery or any other award mechanism.

57. To preserve Plaintiff's ability to obtain a remedy and this Court's ability to afford one, the Court should order the injunctive relief described below.

## COUNT TWO – DENIAL OF ACCESS TO COURTS
## 42 U.S.C. 1983

58. Plaintiff realleges all allegations of this Complaint as if fully set out herein.

59. Defendants are refusing to afford Plaintiff a procedure at the agency level to receive and score and challenge its failure to afford them the deficiency notice and cure rights and its decision denying them Tied Applicant status.

60. Although Defendants have invited all non-eligible applicants to file lawsuits to challenge the Department's conduct and decisions, Defendants intend to deprive the court of the ability to provide relief for any violation. Specifically, Defendants intend to

award the Licenses before any court can act.

61. By all of the above, Defendants, and each of them, are depriving Plaintiff of access to court. If Plaintiff proves a violation by the Department and entitlement to Tied Applicant status, the Department will contend that no Licenses will remain to be awarded such that this Court has no power to grant relief. Plaintiff has been injured as a direct and proximate result.

62. To remedy at least part of Plaintiff's injuries, the Court should issue the injunctive relief demanded below.

## COUNT THREE – DENIAL OF EQUAL PROTECTION
## 42 U.S.C. 1983

63. Plaintiff realleges all allegations of this Complaint as if fully set out herein.

64. Plaintiff in this action was treated differently than other similarly situated applicants in that those other applicants were given a score and then provided notice of deficiencies and an opportunity to respond to cure them, whereas Plaintiff was not.

65. Had Plaintiff been given the same notice and permitted the same opportunity to cure the stated deficiencies, whatever the Department is claiming them to be, Plaintiff would have qualified for the Lottery.

66. Plaintiff in this case is a member of a protected

21

class, namely African American. The Department treated Plaintiff differently than applicants of other races in that it awarded them a score and thereafter afforded other applicants thorough notice of its findings and an opportunity to address them, whereas it afforded neither to Plaintiff. This disparate treatment is unjustified, subject to strict scrutiny, and is the result of prohibited animus to favor the other applicants. Plaintiff in this case is also victims of "class of one" equal protection violations in that there is no rational basis for the disparate treatment.

### COUNT FOUR – ADMINISTRATIVE REVIEW
### 42 U.S.C. 1983

67. Plaintiff realleges all allegations of this Complaint as if fully set out herein.

68. On or about September 3, 2020, The Department awarded almost if not all of the applicants a score and never awarded the Plaintiff a score.

69. The Department should have reached the conclusion that Plaintiff met all requirements for the highest score and should have been deemed a Tied Applicant as to each of the applications they submitted.

70. The Department is requested to file an answer to this Complaint consisting of the entire record of the process and grading resulting in the decision on Plaintiff's application, including a

score, and on the applications of those deemed Tied Applicants.

71. Plaintiffs have exhausted all available remedies under the Administrative Review Law and have no further plain, speedy, adequate remedy under the law.

## REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court declare that Defendants have exceeded their authority under color of law and grant the injunctive relief sought herein, as well as any other relief available in equity or at law, including but not limited to the Licenses under consideration. The injunctive relief sought includes but is not limited to a Court Order:

A. Directing the Defendants to provide to the Plaintiff a conditional adult use cannabis license application score, as none has been provided to the Plaintiff. In the event of a non-perfect score, Defendants shall be directed to provide a deficiency notice of the same quality and thoroughness afforded the other applicants and accept and grade Plaintiff's revised Exhibits. And upon completing that review, if Plaintiff's scores qualify for placement in the Lottery, Defendants should be further ordered to permit the Plaintiff participate.

Or alternatively:

B. Temporarily enjoin any future lotteries or license awards until the Court can adjudicate the fairness and accuracy of the

Department's process and findings, including but not limited to whether the process for selecting the 21 Tied Applicants and excluding Plaintiffs was inherently flawed, marred by conflict of interest, erroneously executed, and/or violated the Plaintiff's rights.

Or alternatively:

C. Issue Plaintiff a conditional adult use cannabis license.

Respectfully submitted,

*/s Robert M. Fagan*
Attorney for Plaintiff EDBQ, LLC

Law Offices of Robert M. Fagan, Ltd.
10 North Galena Ave., Suite 210
Freeport, IL 61032
(815) 233-5800
Fagan@prodigy.net

24